FILED

2006 Mar-30  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

ROGER FREDRICKSON, et al.,    }
                             }
     Plaintiffs          }
                             }     CIVIL ACTION NO.
v.                       }     04-AR-1396-M
                             }
PELL CITY BOARD OF EDUCATION,  }
et al.,                   }
                             }
     Defendant.          }

## MEMORANDUM OPINION

Before the court is the motion of defendants Pell City Board of Education ("Board"), Superintendent Bobby Hathcock ("Hathcock"), Assistant Superintendent Michael Barber ("Barber"), Board chairman Norman Wilder ("Wilder"), Board member J. T. Carter ("Carter"), Board member Michael Price ("Price"), Board member David Murphy ("Murphy"), and Board member Eric Hicks ("Hicks") for summary judgment and the motion of defendant Transportation Supervisor Della Baker ("Baker") for summary judgment.  For the reasons that follow, summary judgment is due to be granted.

*Summary Judgment Facts[1]*

At issue in this matter are a series of disputes relating to a school bus route, Route #25 ("Bus 25"), run by the Pell City School System ("Pell City Schools").  Plaintiff Roger Frederickson ("Frederickson") is suing the Pell City Schools and various employees, officers and Board members on various federal and state claims.  Frederickson's wife and minor stepchildren, Sylvia Frederickson ("Sylvia"), Melanie Chaves ("Melanie") and Justin Chaves ("Justin") (together, "the Fredericksons"), are also plaintiffs who purportedly sue by and through Frederickson, who is acting as their "guardian."  The court seriously doubts that Frederickson can sue on behalf of his competent adult wife, and Frederickson does not offer proof that he is the legal guardian of his stepchildren.  The driver of Bus 25, Jeana Threatt ("Threatt"), is a central figure to the disputes but is not a party.

Melanie began riding Bus 25 in 2001, and Justin began riding it in 2002 or 2003.  The Fredericksons live at the end of Seddon Point Road, which dead-ends in their driveway.  Seddon Shores

---

[1] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56©, F.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant.  *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir. 1993).  In accordance with this standard, the following statement of facts includes both undisputed facts and the facts according to the plaintiffs' evidence, where there is a dispute.

Drive is the feeder road for Seddon Point Road.  Steve and Samara
Bowers were the Fredericksons' neighbors on Seddon Point Road.
Their children rode Bus 25 with the Frederickson children until
the Bowerses moved in 2003.  Roger Frederickson and the Bowerses
are white Americans and Sylvia Frederickson was born in Costa
Rica.

     In 2001, the bus stop for Bus 25 was approximately 300 yards
from the Frederickson residence and approximately 50 yards from
the Bowers residence.  At the end of the 2002-03 school year,
Baker called the Fredericksons and informed them that the bus
stop would be moved for the following year because the school
system had lost permission to use a private driveway as a
turnaround.  The new bus stop required the Fredericksons to drive
their children approximately 1.25 miles from their home.

     In September 2003, the Fredericksons and the Bowerses met
with Superintendent Hathcock to discuss the turnaround situation.
At the meeting, they also expressed concerns about Threatt's
driving.  Although the meeting focused on the Bowerses'
complaints, Frederickson brought his concerns about Threatt's
driving and treatment of students to Hathcock's attention.
According to Hathcock, this was the first he had learned of
complaints about Threatt.  Prior to the September meeting, the
Bowerses had made several complaints to Transportation Secretary
Baker - twenty to thirty, according to Baker - about Threatt's

3

driving and treatment of their children.  By contrast, the
Fredericksons had made only one complaint about events on Bus 25,
a letter to Baker claiming that Justin Chaves' pencil had been
broken by Threatt's nephew.  After the September meeting, the
Fredericksons met with Board members Wilder and Price to discuss
Threatt's driving and to ask them to prompt Hathcock to action.
After the meeting with Hathcock, Frederickson called the Board on
behalf of Samara to schedule her to speak at the October Board
meeting.  Samara appeared on the agenda and spoke at the Board
meeting.  The Fredericksons attended the meeting without
speaking, although Samara indicated in her remarks that
Frederickson would report to the Board about Threatt's offensive
conduct.  Approximately two months into the 2003-04 school year,
Frederickson arranged for a turnaround closer to his home, and
the school system once again moved the bus stop closer to the
Frederickson and Bowers homes.

        In addition to concerns about the bus route, the
Fredericksons and the Bowerses raised numerous concerns about the
conduct of Threatt and the events on Bus 25.  On October 30,
2003, the Fredericksons and Samara viewed a videotape recorded on
Threatt's bus.  After reviewing the tape, Frederickson decided
his children were being singled out for mistreatment and that

Threatt was unduly chastising all of the children on the bus.[2]
In addition, Steve and Samara Bowers both allege that they were
run off the road by Bus 25, driven by Threatt.  Samara claims she
was run off Seddon Shores Road by Threatt on five occasions.
Steve claims that he was run off the road once and filed a report
with the Pell City Police Department.

As a result of complaints by the Bowerses and the
Fredericksons, Baker asked the police to monitor Threatt's bus in
unmarked vehicles.  Baker also reviewed videotapes that were
recorded on the days of alleged incidents and had police officers
and Board employees and members ride on or observe the bus while
Threatt was driving.  None of these observations indicated that
Threatt had done anything wrong.  On November 3, 2003, Threatt
filed her own report with the Pell City Police Department against
Frederickson and the Bowerses alleging that they harassed her,
followed too closely behind her bus, and attempted to run her off
the road.

On December 1, 2003, Hathcock sent identical letters to the
Fredericksons and the Bowerses in which he stated that the Board
and other entities had "expended an enormous amount of time and
energy in conducting an extensive investigation into your
complaints.  Our investigation has revealed nothing that would

---

[2] While there may be a conflict between Frederickson's statement that his children were being singled out and his statement that all children were chastised, this is not relevant to the court's resolution of the motions for summary judgment.

support your complaints, therefore, we are closing this matter."
That same day, the Board held a special meeting in which it
authorized Hathcock "to take appropriate legal action to address
continued, unsubstantiated complaints and other actions by
parents concerning a particular bus driver, as previously brought
to the Board's attention."  The resolution did not identify
anybody by name, and the agenda was not publicized.

On December 2, 2003, Frederickson filed a report with the
Pell City Police Department against Threatt for hugging Melanie
twice and for telling Melanie to tell her parents to stop
following the bus.  Melanie's deposition indicates that Threatt
asked to hug her the first time and Melanie assented and gave her
a hug and that, the second time, Threatt said "come here and give
me a hug" and Melanie did.  Melanie acknowledged that the hugs
did not hurt and that she had been hugged by Threatt in the past
and it was okay.  However, Melanie did not like being hugged
after being scolded.  The Fredericksons did not contact Threatt
about the hugging and did not pursue a warrant after the incident
report was filed.  After December 2, the Fredericksons took
Melanie and Justin off Bus 25.

On December 5, 2003, the Board sought a temporary
restraining order ("TRO") against the Fredericksons and the
Bowerses in the Circuit Court for St. Clair County, Alabama,
because of their alleged harassment of Threatt and repeated

complaints about an issue the Board claimed to have fully
investigated.  After a full hearing, the state court found that
there was

> evidence of interference with the operation of bus number 25
> by defendants Samara Bowers and Roger Frederickson which
> could adversely affect the safety of the students being
> transported by said bus and, further, that these same
> defendants have made so many repetitious complaints to the
> Plaintiff that the complaints are interfering with the
> orderly administration of the school system.

Accordingly, the court issued a temporary injunction against
Frederickson and Samara that barred them from

> harass[ing], intimidat[ing], or humiliat[ing] the driver of
> bus number 25 while said driver is engaged in and about the
> operation of bus number 25 and, further, that they may not
> operate or cause to be operated any vehicle in such close
> proximity to school bus number 25 so as to interfere with
> its operation.

In addition, Frederickson and Samara were ordered to make all
"repetitious complaints...in writing and not by telephone nor in
person."  The court denied Pell City Schools' request for a TRO
against Sylvia Frederickson and Steve.

In December of 2003, the Bowerses moved to Texas.  Because
the Frederickson children were no longer riding the bus, Pell
City Schools moved the bus stop to Seddon Point Circle, farther
from the Fredericksons' residence.  At around that same time,
Threatt was transferred, at her request, from Bus 25 to Bus 7, a
shorter route.

On February 10, 2004, Threatt no longer drove Bus 25, the
Bowerses had moved, and Melanie and Justin were no longer riding

7

the bus to school.  As a result, the Board moved to dismiss its petition for a permanent injunction, and the state court granted the motion and lifted the TRO.  At this hearing, Frederickson learned that Threatt was no longer driving Bus 25 and requested that the bus stop be moved closer to his residence.  Baker informed Frederickson that she needed to investigate whether the road was safe for the bus.  Baker claims she was concerned about the complaints that the bus had run cars off the road, though the Fredericksons dismiss her concern as "pretextual."

Subsequently, a meeting involving Baker, Barber, the police chief, the city engineer, and city maintenance employees was held on Seddon Shores to address the safety of the street for bus operations.  The Pell City Police Department determined that Seddon Shores was too narrow for safe bus travel, and issued a report to that effect.  As a result, the Board discontinued bus service on Seddon Shores.

On July 1, 2004, the Fredericksons initiated this action. At the time it was filed, the suit contained seven federal claims and seven state tort claims.

*Analysis*

In their responsive brief, the Fredericksons withdraw their claims for national origin discrimination under § 1983; national origin discrimination by association under § 1983; national

8

origin discrimination retaliation under § 1983; national origin discrimination by association retaliation under § 1983; national origin discrimination under Title VII; and Alabama state law claims for negligent/wanton hiring and assault and battery. Accordingly these claims, identified respectively in the complaint as Counts One, Two, Three, Four, Seven, Eight and Fourteen, will not be discussed and will be dismissed with prejudice.

After the Fredericksons' voluntary dismissals, the remaining claims are (1) retaliation based on plaintiff's exercise of protected speech under 42 U.S.C. 1983 and the First Amendment; (2) procedural due process via stigmatization under the Fifth and Fourteenth Amendments; (3) negligent and wanton retention; (4) negligent and wanton supervision and mentoring; (5) outrage and intentional infliction of emotional distress; (6) malicious prosecution; and (7) abuse of process.

*First Amendment Retaliation*

The court first addresses the Fredericksons' retaliation claim.  Insofar as the Fredericksons allege that defendants' pursuit of a TRO constituted retaliation, summary judgment is due to be granted.  This court is unaware of any authority that suggests that the pursuit of an ultimately successful civil claim constitutes retaliation.  This is particularly true where, as

here, the relief sought is an injunction, which by its nature is forward-looking.

To the extent the Fredericksons allege that defendants retaliated by changing or refusing to reinstate the bus route, their claim also fails upon analysis.  The lodging of what the state court described as "so many repetitious complaints [as to] interfer[e] with the orderly administration of the school system" simply does not constitute an exercise of protected speech.  As Justice Holmes noted, "[t]here must be a limit to individual argument...if government is to go on." *Minn State Bd. for Commun. Colleges v. Knight*, 465 U.S. 271, 283, 104 S. Ct. 1058, 1066 (1984) (quoting *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445, 36 S. Ct. 141, 142 (1915)).  In the face of a First Amendment challenge, the Eleventh Circuit has upheld a city council's policy allotting speaking slots only for "legitimate inquiries and discussion by the public and not for the purpose of advancing arguments or repetitious questions concerning matters which the council believes to be closed or not of general public concern." *Rowe v. City of Cocoa*, 358 F.3d 800 (11th Cir. 2004).  Defendants rightly assert that, if such a policy is constitutionally permissible, the Fredericksons had no First Amendment right to continue to complain to the Board and its employees about issues that it determined had been fully investigated.  Therefore, summary judgment is due to be granted

10

on the retaliation claim.

This court next turns to the qualified immunity defense asserted by Superintendent Hathcock, Transportation Supervisor Baker, and the five defendant Board members.  The court addresses qualified immunity for the individual defendants in the event it is wrong that summary judgment is appropriate on the merits of the retaliation claim.

Qualified immunity protects government officials acting within the scope of their discretionary authority, so long as their conduct does not violate clearly established law.  *Harbert Inat'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  Under the Eleventh Circuit's two-part qualified immunity test, the defendant must first show that the conduct at issue occurred while he was acting within the scope of his discretionary authority.  *Id.*  If the defendant meets this burden, the plaintiff must then show that the official's conduct violated clearly established law.  *Id.*  The Fredericksons acknowledge in their briefs that the challenged actions occurred within the scope of these defendants' authority, but they insist that they have met their burden of proving that defendants' conduct violated clearly established law.

For a right to be clearly established, "[t]he contours of the right [the official is alleged to have violated] must be sufficiently clear that a reasonable official would understand

11

that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987). "[T]o defeat summary judgment because of a dispute of material fact, a plaintiff facing qualified immunity must produce evidence that would allow a reasonable fact-finder to find that no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.*[3]

The Fredericksons allege that defendants' retaliated against them for their exercise of free speech rights by filing a civil action against them and by discontinuing bus service on the Fredericksons' street. However, with respect to the TRO, the Fredericksons identify no Supreme Court, Eleventh Circuit, or Alabama Supreme Court decision that could have provided a clear indication to defendants that their commencement of a lawsuit violated the Fredericksons' First Amendment rights. This court knows of no authority that would wave the red flag to school district employees that they are barred from pursuing non-frivolous injunctive relief, especially when the employees are subjected to repeated complaints that, according to the state court, "interfer[e] with the orderly administration of the school

---

[3]Baker's brief mistakenly attributes this quote to *Anderson*, 483 U.S. at 640.

system."

There is a similar lack of authority on the precise issue of whether the discontinuation of bus service is clearly established as a constitutional violation.  This issue presents a closer question simply because the alleged withdrawal of a government service as retaliation for the exercise of First Amendment rights is troubling.  In addition to the dearth of authority on the specific question before the court, very few cases address retaliation claims that are made by plaintiffs who are not government employees.  Indeed, one district court, addressing the issue of a liquor permit that was allegedly denied by a city council because of a plaintiff's complaint about a property assessment, bemoaned the lack of authority on this subject. *Arrington v. Dickerson*, 915 F. Supp. 1516, 1528 (M.D. Ala. 1996) ("The court simply has been unable to find any controlling cases with facts similar to those in the instant action.").  For this reason, the *Arrington* court found that a reasonable city council member would not have known that a permit denial under these conditions constituted a constitutional violation and, therefore, that the defendant council member was entitled to qualified immunity.

Since *Arrington* was decided, the Eleventh Circuit has adopted the "ordinary firmness" standard for First Amendment retaliation claims, under which "a plaintiff suffers adverse

13

action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005).  This decision may have offered some guidance to both this court and defendants had it been available at the time of the alleged retaliation, even though it addressed a significantly different set of facts.  But it had not yet been decided when defendants committed the allegedly retaliatory acts and, therefore, does not help in the analysis of whether such acts were clearly established as constitutional violations at the time.  The absence of any case on point from the Supreme Court, Eleventh Circuit, or Alabama Supreme Court leads to the conclusion that such conduct was not clearly established as a constitutional violation.  Because the case law had not staked out a bright line for defendants to follow at the time of the alleged retaliation, the individual defendants are protected by qualified immunity on the entire First Amendment issue.

*Stigmatization under the Due Process Clause of the Fourteenth Amendment*

The Fredericksons next claim that they were subjected to stigmatization in violation of their procedural due process rights.  As the Fredericksons acknowledge, "the threshold issue in any procedural due process case is whether the plaintiff has

14

shown [a] deprivation of an interest (life, liberty, or property) created by the Fourteenth Amendment." *See Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000). In their summary judgment response brief, the Fredericksons claim that they have been deprived of their "liberty interest" in their relationship with their family because Threatt forced Melanie to give her a hug against Melanie's will and because, thereafter, Threatt's presence so upset Melanie that she erupted into hysterics, thereby "threaten[ing] the very fabric of their familial bond" and "significantly impairing the parent-child relationship." The only authority cited in support of this proposition is *Morrell v. Mock*, 270 F.3d 1090, 1098 (7th Cir. 2001) ("A parent's liberty interest in her relationship with her child is of considerable importance and 'far more precious than...property rights.'") (quoting *May v. Anderson*, 345 U.S. 528, 533, 73 S. Ct. 840 (1953)). However, both *Morrell* and *May* were child custody cases, and neither case contains any language suggesting that the liberty interest in retaining physical custody over one's child extends to the non-custodial context. This court is unaware of any authority that establishes a parent's interest in not having a child break into hysterics, or for that matter in any other interest in the quality or nature of the parent-child relationship except for custody, as an interest that falls within the ambit of the Due Process Clause.

15

Although they do not raise this argument in their summary judgment response brief, the Fredericksons' complaint alleges that the special meeting of the Board on December 1, 2003, at which the Board contemplated legal action including a civil lawsuit, violated their due process rights because they did not receive notice and were not given an opportunity to defend themselves.  As discussed above, this court knows of no right or liberty interest in not being sued in an ultimately successful lawsuit, nor in a right to participate in a hearing at which such a suit is contemplated.  Moreover, as defendants' rightly point out, the evidence simply does not support a finding of stigmatization here.  No names were publicly disclosed at the special meeting or in the resolution produced at the meeting. Thus, the Fredericksons cannot show a deprivation of a liberty or property interest protected by the Fourteenth Amendment. Moreover, no law clearly established for the individual defendants that their conduct amounted to a constitutional violation, so they would be entitled to qualified immunity on this issue even if there were a genuine issue as to whether a due process violation occurred.  Therefore, summary judgment is due to be granted on the Fredericksons' stigmatization claim.

*The Fredericksons' State Law Claims*

The Fredericksons allege negligent and wanton retention;

16

negligent and wanton supervision and mentoring; outrage and intentional infliction of emotional distress; and malicious prosecution and abuse of process.  In response, defendants raise the defenses of both absolute and discretionary-function sovereign immunity and contend that the Fredericksons have not adduced sufficient evidence to prove their claims.  Fortunately for the court, it does not need to address the thicket of immunity issues arising under *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000), and *Louviere v. Mobile County Bd. of Ed.*, 670 So.2d 873 (Ala. 1995), because it finds that the Fredericksons have failed to produce sufficient evidence on the various state tort claims to provide them viability.

The Fredericksons claim negligent and wanton retention, supervision and mentoring based on the allegation that defendants had notice, or should have had notice, of the allegedly "discriminatory, retaliatory, and otherwise unlawful propensities" of Hathcock, Barber, Baker and Threatt.  The Fredericksons have voluntarily dismissed the discrimination allegations, and this court has already held, *supra*, that defendants are entitled to summary judgment on the retaliation claim.  In light of this holding, and the absence of any evidence in the record of retaliatory or otherwise unlawful conduct, summary judgment is due to be granted on the negligent and wanton retention, supervision and mentoring claims.

17

The Fredericksons also allege outrage and intentional infliction of emotional distress.  In a 2000 decision, this court stated:

> "[a]s the Alabama Supreme Court has pointed out many times, the tort of outrage is 'a very limited cause of action that is available only in the most egregious circumstances.'  So far, the Alabama Supreme Court has found that a jury question exists in only three categories of cases: (1) those involving wrongful conduct with regard to family burials; (2) those involving heavy-handed tactics as used by insurance agents; and (3) those involving egregious sexual harassment."

*Montgomery v. City of Birmingham*, No. 98-2100, 2000 U.S. Dist. LEXIS 11491, at *44 (N.D. Ala. Jan. 20, 2000) (quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993).  Like *Montgomery*, the case at bar does not involve burials, insurance agents or sexual harassment.  As in that case, the Fredericksons' outrage claim cannot survive summary judgment "because there is no other evidence to suggest that defendants' alleged conduct was extreme and outrageous or that [the Fredericksons] suffered emotional distress so severe that no reasonable person could be expected to endure it."  *Id* at *45.

Finally, the Fredericksons allege malicious prosecution and abuse of process.  "For purposes of summary judgment...[i]f there are any undisputed facts of record establishing that [the defendant] had probable cause to bring the former action [] against [the plaintiff], then [the plaintiff] cannot recover for malicious prosecution and summary judgment is appropriate."

*Eidsen v. Olin Corp.*, 527 So.2d 1283, 1285 (Ala. 1988).  Here, the undisputed facts show that the repeated complaints from the Fredericksons and the Bowerses and the allegations of harassment provided defendants with probable cause to file this action. This was borne out by the state court's eventual finding that sufficient evidence of interference with Bus 25 and of repetitious complaints that were disrupting the administration of the school system existed to justify a TRO against Frederickson. While the judge declined to issue a TRO against Sylvia Frederickson, she had accompanied her husband to meetings with Hathcock and the Board and to view the Bus 25 videotape, and her association with the harassing behavior of her husband and the Bowerses was sufficient to provide defendants with probable cause to initiate the civil action against her as well as her husband.

With respect to the abuse of process claim, there is insufficient evidence for a jury to conclude that defendants employed the civil litigation process "for an end not germane thereto, for achievement of a benefit totally extraneous to or of a result not within its legitimate scope," as is required for a successful abuse of process claim.  *Willis v. Parker*, 814 So.2d 857, 866 (Ala. 2001) (internal quotations omitted).  While the Fredericksons allege by way of conclusion that this action was initiated as retaliation for their exercise of constitutionally protected speech, the court has already rejected their claim.  It

now determines that no reasonable jury could determine from this record that defendants abused the process of seeking injunctive relief.  Accordingly, summary judgment is due to be granted on both the malicious prosecution and abuse of process claims.

*Conclusion*

For the above reasons, defendants' motions for summary judgment will be granted in their entirety by separate order.

DONE this 30th day of March, 2006.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE